EXHIBIT "1"
TO PLAINTIFF'S EX PARTE MOTION FOR LEAVE TO TAKE
LIMITED DISCOVERY PRIOR TO RULE 26(F) CONFERENCE

**THE DECLARATION OF DANIEL MACEK**

CHARLES C. RAINEY, ESQ.
Nevada Bar No. 10723
chaz@raineylegal.com
RAINEY LEGAL GROUP, PLLC
9340 W. Martin Avenue, Second Floor
Las Vegas, Nevada 89148
+1.702.425.5100 (ph)
+1.888.867.5734 (fax)
*Attorney for Plaintiff*

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| QOTD FILM INVESTMENT LTD., a U.K. private limited company, | Case No.: 2:16-cv-928 |
| Plaintiff, | DECLARATION OF DANIEL MACEK IN SUPPORT OF PLAINTIFF'S MOTION FOR LEAVE TO TAKE DISCOVERY PRIOR TO RULE 26(f) CONFERENCE |
| vs. | |
| DOES 1 – 30 | |
| Defendants | |

1. My name is Daniel Macek. I am over the age of 18 and am otherwise competent to make this declaration. This declaration is based on my personal knowledge and, if called upon to do so, I will testify that the facts stated herein are true and accurate. Pursuant to 28 U.S.C. §1746, I hereby declare under penalty of perjury under the laws of the United States of America that the following is true and correct.

2. I have been retained as a consultant by the forensic investigation service, MAVERICKEYE UG, a German company, organized and existing under the laws of Federal Republic of Germany (the "Investigator").

3. The Investigator is in the business of providing forensic investigation services to copyright owners, such as the Plaintiff.

4. Plaintiff retained the services of the Investigator, and, in turn, retained my services in investigating and preparing the present lawsuit.

5. The Internet is a vast collection of interconnected computers and computer networks that communicate with each other. It allows users to exchange ideas and information freely and

1

easily, including academic research, literary works, financial data, music, audiovisual works, graphics, and an unending and ever-changing array of other data.

6. The Internet also affords opportunities for the wide-scale infringement of copyrighted motion pictures and other digital content.

7. Once a motion picture has been transformed into a digital format, it can be copied further and distributed an unlimited number of times over the Internet, without significant degradation in picture or sound quality.

8. To copy and distribute copyrighted motion pictures over the Internet, many individuals use online media distribution systems or so-called peer-to peer ("P2P") or BitTorrent networks. P2P networks, at least in their most common form, are computer systems that enable Internet users to (1) make files (including motion pictures) stored on each user's computer available for copying by other users; (2) search for files stored on other users' computers; and (3) transfer exact copies of files from one computer to another via the Internet.

9. To use a P2P or BitTorrent distribution system requires more than a click of a button. A software installation and configuration process needs to take place.

10. The P2P systems enable widespread distribution of digital files. Each user of the system who copies a digital file from another user can then distribute the file to other users and so on, such that complete digital copies can be easily and quickly distributed, thereby eliminating long download times.

11. Although the Investigator and Plaintiff have successfully captured data showing the infringement occurring on the Internet, Plaintiff is only able to obtain the IP addresses of the individuals who are committing the infringement and does not yet know the actual identities of the individual defendants.

12. Additionally, the P2P methodologies for which the Investigator monitored for Plaintiff's Motion Picture make even small computers with low bandwidth capable of participating in large data transfers across a P2P network. The initial file-provider intentionally elects to share a file using a P2P network. This is called "seeding." Other users ("peers") on the network connect to the seeder to download. As additional peers request the same file, each additional user becomes

a part of the network (or "swarm") from where the file can be downloaded. However, unlike a traditional peer-to-peer network, each new file downloader is receiving a different piece of the data from each user who has already downloaded that piece of data, all of which pieces together to comprise the whole.

13. This means that every "node" or peer user who has a copy of the infringing copyrighted material on a P2P network can also be a source of download for that infringing file, potentially both copying and distributing the infringing Motion Picture. The distributed nature of P2P leads to rapid spreading of a file throughout peer users. As more peers join the swarm, the likelihood of a successful download increases. Because of the nature of a P2P protocol, any seed peer who has downloaded a file prior to the time a subsequent peer downloads the same file is automatically a possible source for the subsequent.

14. All infringers connected to those files are investigated through downloading a part of the file placed on their computer.

15. This evidence is then saved on a secure server.

16. Once the searching software program identifies an infringer in the way described herein for the Motion Picture for which Plaintiff owns the exclusive licensing and distribution rights, it automatically obtains the IP address of a user offering the file for download and saves it in a secure database.

17. The forensic software routinely collects, identifies and records the Internet Protocol ("IP") addresses in use by those people who employ the BitTorrent protocol to share, copy, reproduce and distribute copyrighted works. In this way the software is connected to files of illegal versions of the Motion Picture.

18. An IP address is a unique numerical identifier that is automatically assigned to an internet user by the user's Internet Service Provider ("ISP"). It only enables Plaintiff to trace the infringer's access to the Internet to a particular ISP. An ISP can be a telecommunications service provider such as Verizon, an Internet service provider such as America Online, a cable Internet service provider such as Comcast, or even an entity such as a university that is large enough to establish its own network and link directly to the Internet. Each time a subscriber

1  logs on, he or she may be assigned a different (or "dynamic") IP address unless the user obtains
2  from his/her ISP a static IP address. ISPs are assigned certain blocks or ranges of IP addresses
3  by the Internet Assigned Numbers Authority ("IANA") or a regional internet registry such as
4  the American Registry for Internet Numbers ("ARIN").  However, some ISPs lease or otherwise
5  allocate certain of their IP addresses to other unrelated, intermediary ISPs.  These intermediaries
6  can be identified by the ISP and the intermediaries own logs will contain the subscriber
7  information.

8     19. In logs kept in the ordinary course of business, ISPs keep track of the IP addresses
9  assigned to their subscribers.  Once provided with an IP address, plus the date and time of the
10 detected and documented infringing activity, ISPs can use their subscriber logs to identify the
11 name, address, email address, phone number and other related information of the
12 user/subscriber.

13    20. Only the ISP to whom a particular IP address has been assigned for use by its
14 subscribers can correlate that IP address to a particular subscriber.  From time to time, a
15 subscriber of internet services may be assigned different IP addresses from their ISP.  Thus, to
16 correlate a subscriber with an IP address, the ISP also needs to know when the IP address was
17 being used. However, once provided with the IP address, plus the date and time of
18 the detected and documented infringing activity, ISPs can use their subscriber logs to
19 identify the name, address, email address, phone number and Media Access Control
20 number of the subscriber.

21    21. Unfortunately, many ISPs only retain this information needed to correlate an IP address
22 to a particular subscriber for a limited amount of time.

23    22. In this case, the Investigator determined that the Doe Defendants identified in Complaint
24 Exhibit 1 were using the ISPs listed in the exhibit to gain access to the Internet and distribute
25 and make available for distribution and copying Plaintiff's copyrighted motion picture.

26    23. It is possible for digital files to be mislabeled or corrupted; therefore, the Investigator (as
27 agent for Plaintiff) does not rely solely on the labels and metadata attached to the files
28 themselves to determine which motion picture is copied in the downloaded file, but also to

4

confirm through a visual comparison between the downloaded file and the Motion Picture themselves.

24. As to Plaintiff's copyrighted Motion Picture, as identified in the Complaint, a member of the Investigator watches a DVD of the original Motion Picture.

25. After the Investigator identified the Doe Defendants and downloaded the motion pictures they were distributing, the Investigator opened the downloaded files, watched them and confirmed that they contained the Motion Picture identified in the Complaint.

26. To identify the IP addresses of those BitTorrent users who were copying and distributing Plaintiff's copyrighted Motion, the Investigator's forensic software scans peer-to-peer networks for the presence of infringing transactions.

27. After reviewing the evidence logs, I isolated the transactions and the IP addresses of the users responsible for copying and distributing the Motion Picture.

28. Through each of the transactions, the computers using the IP addresses identified in Complaint Exhibit 1, transmitted a copy or a part of a copy of a digital media file of the copyrighted Motion Picture identified by the hash value set forth in Complaint Exhibit 1.  The IP addresses, hash values, dates and times contained in Complaint Exhibit 1 correctly reflect what is contained in the evidence logs.  The subscribers using the IP addresses set forth in Complaint Exhibit 1 were all part of a "swarm" of users that were reproducing, distributing, displaying or performing the copyrighted Motion Picture.

29. Moreover, the users were sharing the exact same copy of the Motion Picture.  Any digital copy of an audiovisual work may be uniquely identified by a unique, coded, string of characters called a "hash checksum."  The hash checksum is a string of alphanumeric characters generated by a mathematical algorithm known as US Secure Hash Algorithm 1 or "SHA-1". By using a hash tag to identify different copies of the Motion Picture, the Investigator was able to confirm that these users reproduced the very same copy of the Motion Picture.

30. The Investigator's software analyzed each BitTorrent "piece" distributed by each IP address listed in Complaint Exhibit 1 and verified that reassembling the pieces using a specialized BitTorrent client results in a fully playable digital motion picture.

31. The software uses a geolocation functionality to determine the location of the IP addresses under investigations. The location of each IP address is set forth in Exhibit 1 of the Complaint. IP addresses are distributed to ISPs by public, nonprofit organizations called Regional Internet Registries. These registries assign blocks of IP addresses to ISPs by geographic region. Master tables correlating the IP addresses with local regions are maintained by these organizations in a publicly-available and searchable format. An IP address' geographic location can be further narrowed by cross-referencing this information with secondary sources such as data contributed to commercial database by ISPs.

Executed on  13  April , 2016.

_____
Daniel Macek

RAINEY LEGAL GROUP PLLC
9340 W. Martin Avenue
Las Vegas, Nevada 89148
+1.702.425.5100 (ph) / +1.888.867.5734 (fax)